

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 5, 2017 Session

**STATE OF TENNESSEE v. WILLIAM LANGSTON**

**Appeal from the Criminal Court for Shelby County**
**No. 14-04014     J. Robert Carter, Jr., Judge**

———————————————————

**No. W2015-02359-CCA-R3-CD**

———————————————————

The Defendant-Appellant, William Langston, was convicted by a Shelby County jury of the second degree murder of his wife and received a twenty-year sentence. On appeal, Langston argues: (1) the trial court erred by denying his request to enter a guilty plea to a pending indictment charging him with voluntary manslaughter; (2) the trial court abused its discretion when it accepted a police officer as an expert in the field of blood spatter analysis at trial; (3) the instructions in his case precluded the jury from considering the offense of voluntary manslaughter; (4) the evidence is insufficient to sustain his conviction; and (5) his sentence is excessive. We affirm the judgment of the trial court but remand the case for entry of a corrected judgment reflecting the date that the second degree murder conviction was entered following sentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed;**
**Case Remanded**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Howard B. Manis, Memphis, Tennessee, for the Defendant-Appellant, William Langston.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Marianne L. Bell and Danielle McCollum, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

On December 5, 2013, the Shelby County Grand Jury indicted Langston in case number 13-05917 for the voluntary manslaughter of his wife, Kimberly Langston. On

August 19, 2014, the grand jury issued a superseding indictment in case number 14-04014 charging Langston with the first degree premeditated murder of his wife.

On September 16, 2014, after submitting an order regarding the substitution of counsel in case number 13-05917 and prior to the prosecutor's arrival in court, defense counsel informed the trial court that Langston intended to enter an "open" guilty plea to the voluntary manslaughter charge, whereby he agreed to plead guilty and to be sentenced at the discretion of the trial court. He conceded that he had not yet spoken to the prosecutor about this guilty plea. The trial court, recognizing that Langston had been charged in a superseding indictment with first degree premeditated murder, stated that it would not take any action until the prosecutor appeared in court.

When the prosecutor arrived a few minutes later, she announced the State's intention to proceed on the superseding indictment charging Langston with first degree premeditated murder and requested that the court sign a judgment entering a nolle prosequi to the indictment charging Langston with voluntary manslaughter. Defense counsel urged the trial court not to sign this judgment on the ground that Langston had already announced his intent to enter a plea to voluntary manslaughter. He also asserted that the indictment charging Langston with first degree premeditated murder was not a superseding indictment but a new indictment and that the State had been given several opportunities to dismiss the old indictment once it obtained the new indictment. When the trial court asked if the defense was under the impression that the State could not dismiss the indictment in case number 13-05917, defense counsel replied that the old indictment was pending when Langston appeared in court that morning and that the State had not yet dismissed it. Defense counsel also claimed that Langston had a right to change his plea from not guilty to guilty pursuant to Tennessee Rule of Criminal Procedure 11. At that point, the trial court asserted that it had the discretion to determine whether to accept the plea, and defense counsel replied that the court's discretion was limited to determining whether there was a factual basis for the plea and whether the plea was knowing, intelligent, and voluntary. The court responded that it probably would have accepted Langston's plea to voluntary manslaughter if it had occurred prior to the issuance of the new indictment, but that in light of the indictment charging him with first degree premeditated murder, Langston no longer had the option of entering a guilty plea to voluntary manslaughter. The court then granted the State's motion, entered the judgment dismissing the indictment for voluntary manslaughter, and rejected Langston's attempt to enter a guilty plea.

Next, Langston filed an unsuccessful motion seeking permission to file an interlocutory appeal under Rule 9 of the Tennessee Rules of Appellate Procedure regarding the trial court's rejection of his plea to voluntary manslaughter before seeking an extraordinary appeal in this court pursuant to Rule 10 of the Tennessee Rules of

Appellate Procedure.  This court denied the Rule 10 appeal on January 30, 2015.  See State v. William Langston, No. W2014-02202-CCA-R10-CD, slip op. at 1-4 (Tenn. Crim. App. Jan. 30, 2015) (Rule 10 Order).  In its order, this court noted that Langston did not have an absolute right to enter a guilty plea and that the trial court was not bound to accept a plea even if the offered plea met the constitutional test.  Id. at 2.  This court also recognized that the prosecutor's discretion to terminate a pending prosecution "'should not be judicially disturbed unless clearly contrary to manifest public interest.'" Id. at 3 (quoting State v. Harris, 33 S.W.3d 767, 770 (Tenn. 2000)).  In denying the application for extraordinary review, this court concluded that the State's decision to dismiss the indictment charging voluntary manslaughter was not "clearly contrary to manifest public interest" and that the trial court had not abused its discretion in rejecting the guilty plea.  Id.

**Trial.**  The victim, Kimberly Langston, operated a daycare facility in the home she shared with her husband, William Langston, the Defendant-Appellant in this case.  At the time of her death, the victim had obtained a master's degree, was planning to open a daycare outside her home, and was about to obtain her daycare center license.  She also worked as a substitute teacher.

The victim and Langston argued with increasing frequency and intensity in the months prior to the victim's death.  Approximately one month before the victim died, Jennifer Flack, the victim's relative and employee, heard Langston yelling at the victim as she and the daycare children entered the home.  A few days before the victim's death, Langston called the victim's sister, Bernadette Sutton, during an argument and told Sutton to come get the victim.[1]  Sutton said Langston was "hysterical" during this conversation and informed her that the victim had started coming home whenever she wanted, which caused her to worry.  When Sutton went over to check on the victim the next day, Langston told her the victim had called the police on him the previous night and that he was tired of having a daycare in his home.  Both Flack and Sutton admitted they had never witnessed Langston threatening or physically abusing the victim.

The day before the victim's death, Marshaye Smith, the victim's best friend, saw the victim and Langston at their home.  Smith could tell they had been arguing, and she told the victim not to say anything to Langston because he looked like he was going to "blow."  Smith said she had overheard several arguments in which Langston called the victim derogatory names and threatened to throw her out of the house and the victim claimed she was going to divorce Langston and demand alimony and child support.

---

[1] We acknowledge that we do not use titles when referring to every witness.  We intend no disrespect in doing so.  Judge John Everett Williams believes that referring to witnesses without proper titles is disrespectful even though none is intended.  He would prefer that every adult witness be referred to as Mr. or Mrs. or by his or her proper title.

During one of these arguments, Smith told the victim to call 9-1-1 because she could tell that Langston was "upset, angry."

On May 24, 2013, at approximately 7:00 a.m., K.L.,[2] the victim and Langston's twelve-year-old daughter, was awake but resting in her bed with her eyes closed. As she was lying there, K.L. heard her parents arguing. She heard Langston say, "Where my keys at, Kim?" Then she heard the victim respond that she did not know where his keys were, and their argument intensified. Langston informed the victim that he would keep her cell phone until she returned his keys, and the victim threatened to call the police. K.L. then heard Langston say, "[G]o on and stab me, Kim."

A moment later, K.L. heard the home's alarm system sound, which meant that someone had opened the back door near the kitchen. Approximately a minute later, the alarm system sounded again, and K.L. knew that this person had reentered the home. An instant later, she heard a gunshot. K.L. said she did not hear her parents talking to one another from the time she heard the person reenter the home to the time she heard the gunshot.

K.L. got up when she heard the gunshot, and Langston, who looked shocked, ran into her bedroom and said, "I ain't try to do it, I ain't try to do it." K.L. and her father went into the living room, where K.L. saw her mother lying dead on the floor. K.L. did not notice a knife near her mother's bodybut saw her one-year-old cousin sitting in a baby chair near the body. Langston went outside, and K.L. called the police. Shortly thereafter, Rudy Mosby, a neighbor, and one of K.L.'s teachers stopped to help until the police arrived. K.L. heard her father tell Mosby that he did not mean to do it. K.L. said that although her parents often argued prior to her mother's death, she never witnessed any physical violence.

At around 7:45 a.m. on May 24, 2013, Officer Brett Giannini approached Langston in the driveway of his home. Langston appeared "nervous" and "kind of hysterical" and had blood stains on his shirt. Langston told Officer Giannini that he "didn't mean to do it" and that he had taken his gun, which was wrapped in a shirt, and had thrown it into the vacant lot next door. After placing Langston in the back of his patrol car, Officer Giannini went inside the home and observed the victim, who was clearly deceased, but did not observe a knife near the victim. Langston later told Officer Giannini that the argument with the victim had started over some keys, and then the victim pulled a knife on him, and he had a gun wrapped in a shirt. Langston said he did not believe his gun would fire, that he did not mean to pull the trigger, and that the shooting was accidental. Langston also said his gun was still wrapped in the shirt when it

_____

[2] It is the policy of this court to identify minors by their initials only.

- 4 -

fired. Officer Giannini later walked to the edge of the property and saw a shirt lying on the ground on the other side of the fence, which was consistent with what Langston had told him.

That same morning, Investigator Charles Cathey walked to the vacant lot next door and found a black nine millimeter semiautomatic handgun wrapped in a blue and white shirt. After photographs were taken, Investigator Cathey unwrapped the gun and unloaded it before placing it into evidence. As he was unloading the handgun, he noticed that one casing was lodged in the chamber and had not been properly ejected from the gun and that a live round had attempted to feed into the chamber. He also noted that the gun's magazine plate, which keeps rounds in the magazine, had come loose from the weapon before he unloaded it. Investigator Cathey said the handgun, which was an older model, was in poor condition and that because the casing had not been properly ejected from the gun to allow the next live round to be fired, the gun had malfunctioned. However, he asserted that once the trigger was pulled on the gun, the bullet would fire regardless of whether the casing became lodged in the chamber.

Later, Investigator Sheila Wright took photographs and measurements and sketched the crime scene based on instructions from the lead officer at the scene She noted that the victim's right hand was slightly clenched and that the end of a knife was under the victim's right shoulder. However, she acknowledged that the paramedics had handled the victim's body before she arrived on the scene. Investigator Wright later collected the knife and a bullet found on floor near the victim as evidence. She also took one measurement of blood spatter on the wall behind the victim but admitted she did not measure the height of each of the blood spatters on this wall. She also acknowledged that she had not been instructed to measure the height of the bullet hole in the wall and had not been told to take any measurements regarding the trajectory of the bullet that killed the victim.

Sergeant Michael Brown, a homicide investigator, later talked to Langston at the police station after he was advised of his rights. Sergeant Brown did not make any notes of this discussion, and their meeting was not recorded pursuant to police department policy. During this discussion, Langston informed Sergeant Brown that the victim had been out all night and had something belonging to him, and when he asked her for it, an argument ensued. The victim ran into the kitchen, grabbed a knife, and told him that if he did not leave her alone she was going to "stick him," and Langston told her to get away from him. Once he got around the victim in the kitchen, Langston went outside to his shed and retrieved his gun. He reentered the home and told the victim to put the knife down, but she refused. He then raised the gun at the victim, told her that he would defend himself, and again instructed her to put the knife down. He said that as he had the gun raised in the direction of the victim, it went off a single time. Langston knew the

victim had likely been hit by the bullet because he saw her fall. After the gun fired, he carried it back outside to the shed, reentered the home, and tried to "wake up" the victim. Langston then took his daughter, K.L., and her cousin to a neighbor's home. When Sergeant Brown asked Langston why he got his gun instead of calling the police after he was able to escape the victim with the knife, Langston got agitated, claimed he acted in self-defense, and began calling Sergeant Brown a "mother f[-----]" and a "b[----]" for asking him that question before informing him that he no longer wanted to talk to him. Sergeant Brown acknowledged that from 11:36 a.m. when he began talking to Langston to just after 2:00 p.m. when he signed his written statement, Langston never wavered from his version of what happened.

Langston subsequently gave a formal written statement that was consistent with what he had told Sergeant Brown. In this statement, Langston said that the victim had been armed with a ten-inch knife and that he had been eight feet away from the victim when his gun fired and the bullet struck her. He said that the victim, who had the knife in her left hand, pointed it at him and said that if he got near her she would stab him. In response, Langston went outside to his shed to get his gun, reentered the house, and went into the living room. When the victim came at him with the knife, he raised his gun, which was wrapped in a shirt, and "it went off." Langston saw the victim fall, and he went to her, held her head, and wiped the blood off of her. He also threw his gun, still wrapped in the shirt, into the lot next door. Then he went into his daughter's room, got her up, and told her to call 9-1-1. Because his daughter was screaming, he went across the street and told his neighbor that he had accidentally shot his wife. Langston said the police arrived a short time later, and he told an officer what happened.

In his statement, Langston said he went outside to get his gun because he was "scared" and "wanted to protect [him]self." He also said he reentered his home because he wanted to get the keys to his car so he could leave. Langston said his gun had been loaded for "the last seven or eight years" and "was cocked and [he] couldn't get it uncocked," which was "how the gun went off." He maintained that his wife would have stabbed him if he had not acted and that he never intended to shoot her.

Langston also asserted in his statement that the victim had, in the past, hit him over the head with a vase, pulled knives on him several times, and cut him and his clothes. He said that the victim was "crazy," that she had stabbed two people and had stolen her father's truck, and that she had threatened to hurt him. He said the victim claimed she would not be punished for attacking him because she would "play crazy." Langston insisted that although his wife had been sleeping with another man for months, he was not jealous and just wanted her to live her life so he could live his, but she refused to leave. He denied ever hitting the victim.

- 6 -

Special Agent Cervinia Braswell of the Tennessee Bureau of Investigation, who was accepted as an expert in the field of firearms identification, analyzed the gun involved in this case. She confirmed that the cartridge case and the bullet found at the scene had been fired by this gun. After conducting several test fires of the gun, Agent Braswell concluded that it was not malfunctioning. She noted that the handgun's floor plate, which held the magazine in place, was cracked so that it would not remain on the gun and that because the floor plate was plastic, it could be broken if the gun was thrown. She further observed that the gun's two safety mechanisms, a manual safety on the side of the gun and a quarter-cock function that kept the hammer from resting on the firing pin, were both functioning and would have prevented the weapon from being fired unintentionally. Agent Braswell stated that the gun would not fire if it was dropped or if something hit the back of the hammer and would only fire if someone pulled the trigger. She also observed that the handgun did not have a hair-trigger because the trigger pull was in the medium range at 6.5 pounds of pressure. She said that if the gun had been wrapped in a shirt when it was fired, then the shirt could have impeded the rearward travel of the gun's slide, which could have resulted in a cartridge casing not ejecting properly. Finally, Agent Braswell said that the gun's trigger guard prevented an individual from accidentally pulling the trigger.

Dr. Erica Curry, a medical examiner, was accepted as an expert in the field of forensic pathology. She stated that she had reviewed the victim's autopsy report generated in her office and noted that the victim sustained a fatal gunshot wound to the head, with the bullet entering at the victim's left eyebrow and transecting the brain stem and cerebellum before exiting the back of the skull. Dr. Curry said the areas of the brain damaged by the bullet controlled respiration, heartbeat, motor function, and consciousness, which made the victim's injuries fatal. She also noted that the bullet's trajectory was slightly downward from the front to the back because the entrance wound was approximately one inch higher than the exit wound. Dr. Curry stated that the gun-powder stippling near the entrance wound indicated that the gun was fired at the victim from an intermediate range of between six inches and three feet.

Lieutenant Anthony Mullins, who was accepted as an expert in the area of blood spatter analysis, stated that he reviewed the crime scene photographs, the crime scene sketches, Langston's statement, the photographs of Langston's person, the victim's autopsy report, and the officers' reports and supplements before writing a detailed report regarding his opinion in this case. He opined that it was "more likely that [the victim] was sitting down than she was standing at her full height" at the time she was shot. While acknowledging that the victim "could be kneeling" or "could be standing and stooped over," Lieutenant Mullins said he did not believe either of these options were likely given the final position of the victim's body. Instead, he thought "it was more likely . . . that she's lower to the ground and probably seated on the floor." Lieutenant

Mullins said that if the victim had been standing up, he would have expected the blood spatter from the exit wound to have hit the wall around the victim's height of five feet and four inches and below. Instead, the blood spatter on the wall was at the height of four feet and below. Moreover, if the victim had been standing upright, he would have expected to see blood spatter from the entrance wound on the top of her feet, but there was no blood present there. He also concluded that the blood on Langston's shirt indicated that he was fairly close to the victim when he fired the shot. He added that if the victim had been standing when shot, he would have expected the blood to be higher on Langston's shirt.

Although Lieutenant Mullins opined that the victim was most likely seated when she was shot, he could not rule out the possibility that she was standing or standing while stooped over at the time of the shooting, which was consistent with her lunging to stab someone. He acknowledged it was difficult for him to form an opinion about the victim's position at the time of the shooting because he was given limited photographs and sketches of the scene. He acknowledged that he was not present at the crime scene and did not have control over what photographs were taken at the scene, which meant that inconsistent blood stains could have existed that were not depicted in the available photographs. When asked about whether the trajectory rod used at the scene affected his opinion, Lieutenant Mullins stated that he could not "say with any scientific certainty that [the victim] wasn't standing or kneeling or, you know, stooped" but asserted that he did not "think that the trajectory [rod] would completely exclude [the victim being] seated in some position there." Lieutenant Mullins observed that emergency medical personnel likely moved the victim's body at least slightly and that this movement could have affected the accuracy of his opinion. When asked by the defense if it would be fair to say that his opinions, at best, were highly speculative, Lieutenant Mullins answered:

> What I would say is this. Not being on the scene, not having the photographs that I would like to have, not having the measurements that I would like to have, not having seen it with my own eyes, I have to speculate about some things for example the knife and the cell phone based on where they are in the photographs. Some things I can tell you definitively and some things I can't say and exclude all other possibilities. I wouldn't say it's speculation but it's the best that I can do with the information that I'm given.

Ross Gardner, who was accepted an expert in the field of crime scene reconstruction and blood stain pattern analysis, testified for the defense. Gardner opined that the victim had been in a generally upright position at the time she was shot. He explained that he owned a forensic education and consulting group, had a military and law enforcement background, had written many articles on crime scene investigation, had

- 8 -

completed over 3000 hours in formal training in criminal investigation, including 1000 hours in crime scene investigation, and was a member of several international professional associations for blood pattern analysis, identification, and crime scene reconstruction. He said that he had been accepted as an expert for the prosecution and the defense in the fields of crime scene investigation and blood pattern analysis throughout the United States. He also said his report in this case had been peer reviewed.

Gardner said he reviewed the crime scene photographs, the autopsy report and photographs, the crime scene sketch, the report from Lieutenant Mullins, and the police reports before forming an opinion as to the victim's position at the time of the shooting. He asserted that the ballistics evidence, when he combined with his reconstruction software, established that the victim was generally in an upright position at the time she was shot. Given the location of the bullet hole in the wall, the estimated distance between the victim and the wall, and the trajectory for the bullet, Gardner opined to a reasonable degree of scientific certainty that the victim was not seated at the moment she was shot. While he believed that the victim's "wound correlate[d] to the trajectory if she's in an upright position," Gardner acknowledged that the victim could have been slightly crouched at the time she was shot. He also opined that the knife was "dynamically involved in the incident" and had not been staged after the fact.

Gardner recognized some difficulties regarding the nature of the evidence. He acknowledged that because there were not many crime scene measurements, he was required to estimate a substantial amount of data, including the measurements of a nearby crib mattress from which he deduced other measurements. He also acknowledged that he used the word "approximation" thirteen times in his report and that he did not have all the photographs and measurements he would have liked when making his three-dimensional reconstruction of the crime scene.

Reginald Langston, the Defendant-Appellant's brother, stated that he spent a substantial amount of time with his brother and the victim prior to the shooting. He said that on the night prior to the victim's death, he and his brother watched a basketball game together, and his brother appeared to be in a good mood. He admitted that he had not been present when his brother fatally shot the victim.

Michael Reddoch, the Defendant-Appellant's friend, said that he had known Langston for thirteen years. He said he first met Langston when Langston was a waiter for his family at the Memphis Country Club. He said that in 2013, following the shooting incident, Langston worked for him at his company and was a reliable employee. While Reddock believed that Langston was an honest and truthful person, he admitted he had not met the victim and did not have any knowledge about Langston's relationship with his wife.

- 9 -

Following the conclusion of the proof, the jury convicted Langston of second degree murder, and the trial court imposed a mid-range twenty-year sentence. A judgment of conviction was entered, and Langston filed a motion for new trial on November 24, 2015, which was denied. Langston then filed a timely notice of appeal.

We note that the entry date on Langston's judgment appears to be incorrect. Although this judgment, which reflects Langston's twenty-year sentence for the second degree murder conviction, had an entry date and a filing date of October 9, 2015, which was the date the jury returned the verdict in this case, the cover page of the transcript of Langston's sentencing hearing shows a date of November 9, 2015, and the first page of the sentencing transcript shows that Langston's sentencing hearing took place on November 6, 2015. In any case, it appears that Langston's motion for new trial, which was filed on November 24, 2015, was timely. However, in light of the aforementioned clerical error, we remand the case for entry of a corrected judgment showing the date that the second degree murder conviction was entered following sentencing.

## ANALYSIS

**I.    Plea to Voluntary Manslaughter.**    Langston contends that he had a constitutional right to enter a guilty plea to the pending indictment charging him with voluntary manslaughter. He also asserts that the trial court abused its discretion in granting the State's request to enter a nolle prosequi to this indictment without first determining whether there was a factual basis for the plea and whether his plea was knowing, voluntary, and intelligent.

Langston notes that at the time the indictment charging voluntary manslaughter was dismissed, both indictments had been pending before the trial court for almost a month, the State had appeared in court on two prior occasions without announcing its intent to dismiss the voluntary manslaughter indictment, there were no deadlines regarding the entry of a guilty plea, and the court had allowed him to enter an order substituting counsel in that matter. Langston claims that it was only when he sought to enter his guilty plea to the original indictment charging him with voluntary manslaughter that the State asked the trial court to enter an order dismissing this indictment. He further claims that the State's decision to leave both indictments pending for an extended period of time left the door open for him to enter a guilty plea to the indictment charging him with voluntary manslaughter.

In denying Langston's application for extraordinary review on this issue, this court held as follows:

- 10 -

A defendant does not have an absolute right to plead guilty. State v. Williams, 851 S.W.2d 828, 830 (Tenn. Crim. App. 1992). Rather, strict standards apply before a trial court may accept a plea. Id. (citing State v. Mackey, 553 S.W.2d 337 (Tenn. 1977)). "Even if the offered plea meets the constitutional test, the trial court is not bound to accept it." Id. (citing North Carolina v. Alford, 400 U.S. 25, 38 n.11 (1970); Farmer v. State, 570 S.W.2d 359 (Tenn. Crim. App. 1978)). Rather, the trial court is afforded discretion in the acceptance of pleas. Id. As a result, we cannot set aside a trial court's judgment on appeal absent "a plain abuse of authority." Id. "In order for a reviewing court to find abuse, it must appear that no substantial evidence supports the conclusion of the trial judge." Id.

In the present case, the Defendant sought to plead to an indictment that had been superseded. "A superseding indictment is an indictment obtained without the dismissal of a prior indictment." State v. Harris, 33 S.W.3d 767, 771 (Tenn. 2000). When jeopardy has not yet attached on the first indictment, "a grand jury may return a new indictment against an accused even though another indictment is pending." Id. "[T]he State may obtain a superseding indictment at any time prior to trial without dismissing the pending indictment and may then select the indictment under which to proceed at trial." Id.

Contrary to the Defendant's assertion, the indictment for first degree murder constituted a superseding indictment as it was obtained without the dismissal of the prior indictment for voluntary manslaughter. When the Defendant sought to plead guilty to voluntary manslaughter, the prosecutor was not present, and the State had not yet selected the indictment under which it intended to proceed at trial. After the prosecutor arrived and the trial court called the Defendant's case, the prosecutor announced her intention to seek a nolle prosequi on the indictment for voluntary manslaughter and proceed with the indictment for first degree murder.

Tennessee Rule of Criminal Procedure 48(a) provides that "[w]ith the court's permission, the state may terminate a prosecution by filing a dismissal of an indictment, presentment, information, or complaint." Rule 48(a) only grants the trial court limited control over the prosecutor's discretionary powers. Harris, 33 S.W.3d at 770. Rather,

> "[t]he [State] remains the absolute judge of whether a prosecution should be initiated and the first and presumptively the best judge of whether a pending

- 11 -

prosecution should be terminated. The exercise of its discretion with respect to the termination of pending prosecutions should not be judicially disturbed unless clearly contrary to manifest public interest."

Id. (quoting United State v. Cowan, 524 F.2d 504, 513 (5th Cir. 1975)).

There is nothing in the transcript or pleadings attached to the Defendant's application establishing that the State's decision to dismiss the voluntary manslaughter charge was "clearly contrary to manifest public interest." Absent such a showing, the trial court was required to grant the State's request and dismiss the indictment for voluntary manslaughter. Under these circumstances, the trial court did not abuse its discretion in rejecting the Defendant's guilty plea to voluntary manslaughter in case number 13-05917.

See State v. William Langston, No. W2014-02202-CCA-R10-CD, slip op. at 2-3 (Tenn. Crim. App. Jan. 30, 2015) (Rule 10 Order).

We wholeheartedly agree with the authorities and reasoning provided in the order denying Langston's application for extraordinary review. In this direct appeal, Langston has again failed to show that the State's decision to dismiss the indictment for voluntary manslaughter was "clearly contrary to manifest public interest." In the absence of such a showing, the trial court was obligated to grant the State's request to enter a nolle prosequi to the indictment charging Langston with voluntary manslaughter, which clearly precluded Langston from entering a guilty plea to that offense.

**II. Acceptance of Officer as Expert.** Langston also contends that the trial court abused its discretion in allowing Lieutenant Anthony Mullins to testify as an expert in the area of blood spatter analysis and to opine that the victim was seated at the moment she was shot. Langston claims Lieutenant Mullins had insufficient formal education in blood spatter analysis, was unfamiliar with the current terminology and methodology in this field, and reached conclusions based on incomplete data. He adds that Lieutenant Mullins's opinions were not peer-reviewed, that he was unfamiliar with the potential rate of error for the methodology he employed, and that he failed to provide his opinion to a reasonable degree of scientific certainty. Finally, Langston asserts that because Lieutenant Mullins was not qualified to offer an expert opinion, his testimony that the victim was seated at the time she was shot, which was uncorroborated and negated by his own expert, was "highly speculative," "extremely prejudicial," and "inflammatory."

During voir dire, Lieutenant Anthony Mullins stated that he had been an officer with the Memphis Police Department for twenty seven years and had been employed in the homicide bureau for nearly ten years, where he had worked on 500 to 800 homicide cases. He said he attended a basic crime scene investigation course lasting fifty-six hours and a basic blood stain pattern analysis course in 2003 lasting forty hours that was taught by expert Paulette Sutton. Lieutenant Mullins said he had worked some crime scenes with Paulette Sutton and had gained experience in crime scene investigation and blood pattern analysis from the many cases he worked as a homicide detective. He also said he had testified as an expert in the areas of blood pattern analysis and crime scene investigation in six or seven of the criminal courts in Shelby County.

Lieutenant Mullins acknowledged that he had not taken any advanced classes in the areas of blood pattern analysis or the effect of blood stains on fabrics and that he had not completed any math or physics courses on blood stain analysis. He also acknowledged that he had not undergone a formal mentorship program in the area of blood pattern analysis and had not completed a shooting reconstruction course. When asked by the defense if he considered himself a forensic analyst, Lieutenant Mullins responded:

> What I consider myself is a Homicide detective, okay. I don't consider myself the best person I know for blood stain pattern analysis or crime scene investigation. My expert tag, if you will, my expert moniker is only in the courtroom. My view of it is because I've had training more than the average officer, more than the average Homicide investigator and I've used it more than the average [officer or investigator]. But like I said, I'm not the best that I know and I'm definitely not the best out there.

Lieutenant Mullins admitted that he had not obtained blood pattern analysis certifications, did not belong to any international associations in that field, and did not read current journals or magazines on blood pattern analysis. He said he had not subjected his opinion in this case to peer review because he did not have the opportunity to so and that he had not done an investigation into the potential rate of error for his methodology. Lieutenant Mullins stated that he had used the skills he learned in blood pattern analysis when asked to look at sketches and photographs of crimes scenes he did not personally investigate and in his current job of supervising the investigation of officer-involved shootings. When asked if his report was flawed because he used principles of blood pattern analysis that were no longer valid because of the passage of time, Lieutenant Mullins replied: "Like I said, I don't consider myself the best that I even know. As far as the basic principles and some of the terms that I use, some of those terms may be no longer used, but some of those principles are still the same, despite the term that might be used."

During a bench conference following voir dire, defense counsel argued, citing McDaniel v. CSX Transp., Inc., 955 S.W.2d 257 (Tenn. 1997), that Lieutenant Mullins should not be qualified as an expert in the field of blood pattern analysis because he was unfamiliar with the current terminology and methodology in this field, because his opinion had not been peer-reviewed, and because he had received only "limited training" in this "highly technical specialty." Despite the defense's objection, the trial court ruled that "based on [Lieutenant Mullins's] experience, training, and education that he is going to be qualified as an expert and allowed to give his opinion." The court reminded defense counsel that he would be allowed to cross-examine Lieutenant Mullins. When the bench conference concluded, the trial court accepted Lieutenant Mullins as an expert in the field of blood spatter analysis and instructed the jury as follows:

> And I'll caution you and I'll tell you again as I've told you for every expert that testifies. Merely because an expert witness has expressed an opinion does not mean that you are bound to accept the opinion. The same as with any other witness, it's up to you to decide whether you believe the testimony and choose to rely on it.
>
> Part of that decision will depend on your judgment about whether the witness' background or training or experience is sufficient to give the expert opinion that you heard.
>
> So again, it will be as always, you all will be the triers and the finders of facts and so I give you the guidance but it will be up to you.

Determinations regarding the qualifications, admissibility, relevance, and competence of expert testimony fall within the broad discretion of the trial court and will be overturned only for an abuse of that discretion. State v. Davidson, 509 S.W.3d 156, 208 (Tenn. 2016) (citing McDaniel, 955 S.W.2d at 263-64; State v. Scott, 275 S.W.3d 395, 404 (Tenn. 2009)). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." Scott, 275 S.W. 3d at 404-05 (citing Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008)).

Rule 702 of the Tennessee Rules of Evidence, which governs the admissibility of expert testimony, provides: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. The

Tennessee Supreme Court has defined the trial court's role in determining the admissibility of expert testimony:

Trial courts act as gatekeepers when it comes to the admissibility of expert testimony. Their role is to ensure that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. A court must assure itself that the expert's opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation. The court's reliability analysis has four general inter-related components: (1) qualifications assessment, (2) analytical cohesion, (3) methodological reliability, and (4) foundational reliability.

Scott, 275 S.W.3d at 401-02 (citations and internal quotation marks omitted).

Tennessee Rule of Evidence 703, which concerns the proper bases for opinion testimony by experts, provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703 (emphasis added).

The trial court, when determining the admissibility of expert testimony, must first determine whether the witness is qualified by knowledge, skill, experience, training, or education to give an opinion within the limits of the witness's expertise. Davidson, 509 S.W.3d at 208; Scott, 275 S.W.3d at 402; State v. Stevens, 78 S.W.3d 817, 834 (Tenn. 2002). In making this determination, the key factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." Stevens, 78 S.W.3d at 834. In other words, the court must determine whether the witness

- 15 -

is an expert in the area in which he or she is providing testimony. Scott, 275 S.W.3d at 402 (citing Tenn. R. Evid. 702).

Next, the trial court must determine whether the basis for the expert's opinion, namely testing, research, studies, or experience-based observations, adequately supports the expert's conclusions to ensure that there is no significant analytical gap between the opinion and the data upon which the opinion is based. Id.; Stevens, 78 S.W.3d at 834. The "connection" between the expert's conclusion and the underlying data supporting the conclusion is especially important when determining the reliability of experience-based testimony because experiences are not easily verified by a court. Stevens, 78 S.W.3d at 834. Nevertheless, a trial court may make a finding of reliability in such cases "if the expert's conclusions are sufficiently straightforward and supported by a 'rational explanation which reasonable [persons] could accept as more correct than not correct.'" Id. (quoting Wood v. Stihl, 705 F.2d 1101, 1107-08 (9th Cir. 1983)).

Courts should also consider the methodological and foundational reliability of the expert's testimony. Scott, 275 S.W.3d at 403. When evaluating the reliability of an expert's testimony, the trial court may consider the following non-exclusive factors:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether, as formerly required by Frye, the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

McDaniel, 955 S.W.2d at 265. "These factors are not requirements for admissibility but may be considered by the trial judge when weighing the reliability of the expert testimony and forensic evidence." Davidson, 509 S.W.3d at 208.

The record shows that the trial court acted within its discretion when it accepted this police officer as an expert. Lieutenant Mullins's testimony during voir dire established that aside from the fifty-six-hour course on crime scene investigation and the forty-hour course on blood pattern analysis, he gained substantial knowledge and experience in this field when he worked on 500 to 800 homicides over the last ten years as a homicide detective. During some of these homicides, he worked with Paulette Sutton, the expert instructor who had taught the blood pattern analysis course he completed. Although Langston contends that Lieutenant Mullins made conclusions based on incomplete data, both Mullins and Langston's expert, Ross Gardner, made inferences based on the limited facts and data available to them. See Tenn. R. Evid. 703 (stating that an expert's opinion may supported by facts or data "of a type reasonably

relied upon by experts in the particular field in forming opinions or inferences upon the subject" and disallowing expert testimony "if the underlying facts or data indicate lack of trustworthiness"). Given Lieutenant Mullins's training and his extensive experience in the field of blood spatter analysis, we conclude that the trial court did not abuse its discretion in allowing him to testify as an expert.

Langston also asserts that Lieutenant Mullins failed to provide his opinion to a reasonable degree of scientific certainty. However, in Tennessee, there is no requirement that specific words be recited in order for expert testimony to be admissible. State v. Thomas Fancher Greenwood, No. M2013-01924-CCA-R3-CD, 2014 WL 6609308, at *33 (Tenn. Crim. App. Nov. 21, 2014); State v. James Clayton Young, Jr., No. 01C01-9605-CC-00208, 1998 WL 258466, at *22 (Tenn. Crim. App. May 22, 1988). The pertinent question is whether the witness's knowledge will substantially assist the jury in understanding the evidence or in determining a fact in issue. James Clayton Young, 1988 WL 258466 at *22-23 (citing Tenn. R. Evid. 702). Because Lieutenant Mullins's testimony substantially assisted the jury in determining a fact in issue, namely whether the victim was sitting or standing at the time she was shot, Langston is not entitled to relief on this issue.

Finally, Langston asserts that Lieutenant Mullins's uncorroborated testimony that the victim was seated at the time she was shot was "highly speculative," "extremely prejudicial," and "inflammatory." He appears to argue that the trial court abused its discretion in allowing Lieutenant Mullins to testify as an expert because the basis for his opinion rendered his testimony unreliable. The record shows that the trial court assured itself that Lieutenant Mullins's opinions were based on relevant scientific methods, processes, and data, and not upon mere speculation. See Scott, 275 S.W.3d at 401-02. The trial court appropriately allowed both Lieutenant Mullins and Ross Gardner to testify as experts. See id. at 404 (concluding that trial courts, when making an admissibility determination, "are not empowered to choose between legitimate competing expert theories" because "that task must be left to the trier of fact"). The jury heard testimony regarding Lieutenant Mullins's and Ross Gardner's qualifications and the trial court appropriately instructed that it was in the discretion of the jury as to the weight and credibility to assign to each party's expert. See State v. Ayers, 200 S.W.3d 618, 223 (Tenn. Crim. App. 2005) (reiterating that the weight to be given expert testimony is a question for the jury under careful instruction of the trial court). Therefore, we discern no error regarding Lieutenant Mullins's qualifications or the opinions he provided at trial.

**III. Jury Instruction.** Langston argues that the sequential jury instructions in his case violated his right to due process and a trial by jury by preventing the jury from considering the offense of voluntary manslaughter. See Falconer v. Lane, 905 F.2d 1129, 1136-37 (7th Cir. 1990) (holding that the petitioner was entitled to federal habeas corpus

relief because the jury instruction, which left the jury with a false impression that it could convict the petitioner of murder even if she possessed one of the mitigating states of mind described in the voluntary manslaughter instruction, violated due process). He asserts that because the first two elements of second degree murder are essentially the same as the elements for voluntary manslaughter, the jury when following the sequential instructions was prevented from considering the lesser included offense of voluntary manslaughter unless and until it acquitted him of the greater offense of second degree murder. He also claims that the trial court's failure to include the distinction between second degree murder and voluntary manslaughter in the definition of second degree murder magnified the erroneous nature of the jury instruction. Consequently, Langston contends that the jury instructions given in his case were erroneous and incomplete because they failed to fairly submit the legal issues and misled the jury. Because this court has consistently upheld substantially similar instructions to those given in this case, we are constrained to conclude that Langston is not entitled to relief.

Although Langston concedes that sequential jury instructions have been upheld, he argues that they "logically preclude[] the jury from ever considering the crime of Voluntary Manslaughter even when there is proof of adequate provocation." He suggests two remedies: (1) an instruction, similar to the self-defense instruction, requiring the State to prove beyond a reasonable doubt the lack of adequate provocation when there is evidence in the record sufficient to warrant an instruction on voluntary manslaughter; and/or (2) an instruction making the passion/adequate provocation definition a part of the murder instruction. See People v. Chavalier, 521 N.E.2d 1256, 1262 (Ill. App. Ct. 1988); State v. Bishop, 589 A.2d 625, 629 (N.J. 1991).

Langston claims that Tennessee courts have long recognized that voluntary manslaughter operates as a partial defense to a second degree murder prosecution. See State v. Jeffrey Lee Mason, No. M2002-01709-CCA-R3-CD, 2004 WL 1114581, at *3 n.2 (Tenn. Crim. App. May 19, 2004), perm. app. denied (Tenn. Nov. 15, 2004) (concluding that a change in the law was needed because "passion and provocation most often operate as a partial defense in a first or second degree murder prosecution"); State v. Khaliq Ra-El, No. W2013-01130-CCA-R3-CD, 2014 WL 3511038, at *6 (Tenn. Crim. App. July 11, 2014) (Witt, J., concurring), perm. app. denied (Tenn. Nov. 20, 2014) ("[T]he reference to passion and provocation in the voluntary manslaughter statute does not denote an essential element of the offense [; instead it] describes a dispensation to a defendant who, having intentionally or knowingly killed another, would otherwise be guilty of first degree or second degree murder respectively."). However, in considering this issue, we must recognize that the statutes for second degree murder and voluntary manslaughter are devoid of any indication that voluntary manslaughter is a partial defense to the crime of second degree murder. In addition, we cannot ignore the fact that Tennessee's statutory scheme clearly defines voluntary manslaughter as a separate

criminal offense rather than a mere defense to second degree murder. See State v. Paul Clifford Moore, Jr., No. E2015-00585-CCA-R3-CD, 2016 WL 2865759, at *8-13 (Tenn. Crim. App. May 12, 2016), perm. app. denied (Tenn. Sept. 22, 2016), cert. denied, --- S. Ct. ---, 2017 WL 1366757 (U.S. Apr. 17, 2017) (No. 16-7239).

Appellate courts in Tennessee have consistently held that state of passion produced by adequate provocation is an essential statutory element of the offense of voluntary manslaughter. See State v. Williams, 38 S.W.3d 532, 538 (Tenn. 2001) ("Comparing the revised second degree murder and voluntary manslaughter statutes, the essential element that now distinguishes these two offenses (which are both 'knowing' killings) is whether the killing was committed 'in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.'"); State v. Sentorya L. Young, No. M2005-01873-CCA-R3-CD, 2008 WL 2026108, at *4 (Tenn. Crim. App. May 12, 2008) ("The lesser charge of voluntary manslaughter also includes the 'knowing killing of another,' but adds the additional element that the killing was done 'in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.'"), perm. app. denied (Tenn. Dec. 8, 2008); State v. Devin Banks, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *32 (Tenn. Crim. App. July 6, 2007) ("The elements which distinguish voluntary manslaughter from either first or second degree murder are those of 'adequate provocation' and the 'state of passion.'"), affirming judgment as corrected, 271 S.W.3d 90 (Tenn. 2008). Even if we preferred a different result, this court has repeatedly recognized that state of passion produced by adequate provocation cannot be treated as a partial defense to second degree murder unless and until such treatment is expressly authorized by the Tennessee Supreme Court or the legislature. See Khaliq Ra-El, 2014 WL 3511038, at *6 (concluding that in light of the Tennessee Supreme Court's decisions in "Parker and Williams, the final determinative discussions that would adopt Judge Witt's analysis should be made by the Tennessee Supreme Court"); Jeffrey Lee Mason, 2004 WL 1114581, at *3 n.2 (stating that while "passion and provocation most often operate as a partial defense in a first or second degree murder prosecution" this issue is perhaps "more appropriately resolved by the legislature than the courts"); see also Paul Clifford Moore, Jr., 2016 WL 2865759, at *13 (noting that both Khaliq Ra-El and Jeffrey Lee Mason "recognize that state of passion produced by adequate provocation cannot be treated as a partial defense to second degree murder unless such treatment is expressly authorized by the Tennessee Supreme Court or the legislature").

Langston specifically contends that the sequential jury instructions, the failure to provide the distinction between second degree murder and voluntary manslaughter in the definition of second degree murder, and the failure to provide counsel with a copy of the jury instructions prior to and during the period when the court charged the jury, resulted in an inaccurate and incomplete statement of the law that misled the jury. In Langston's

case, the trial court provided the following jury instructions on the offenses of second degree murder and voluntary manslaughter, the distinction between these two offenses, and the order of consideration of these offenses, which substantially followed the 2001 version of Tennessee Pattern Jury Instructions 7.05(a), 7.06, and 41.01:

Second degree murder, knowing killing of another. Any person who commits second degree murder is guilty of a crime.

For you to find the defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements: One, that the defendant unlawfully killed the alleged victim; and two, that the defendant acted knowingly.

Knowingly means that a person acts with an awareness that his conduct is reasonably certain to cause the death of the alleged victim.

The requirement of knowingly is also established if it is shown that the defendant acted intentionally.

Intentionally has heretofore been defined for you.

Voluntary manslaughter. Any person who commits voluntary manslaughter is guilty of a crime.

For you to find the defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements: One, that the defendant unlawfully killed the alleged victim; two, that the defendant acted intentionally or knowingly; and three, that the killing resulted from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

The distinction between voluntary manslaughter and second degree murder is that voluntary manslaughter requires that the killing result from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

Knowingly and intentionally have previously been set out for you.

. . . .

- 20 -

Deliberation, order of consideration. In deciding the guilt of the defendant, you shall first consider the offense charged in the indictment. If you find the defendant guilty of that offense beyond a reasonable doubt, you shall return a verdict of guilty for that offense.

If you unanimously find the defendant not guilty of that offense or have a reasonable doubt of the defendant's guilt of that offense, you shall then proceed to consider whether or not the defendant is guilty of the next lesser included offense in order from greatest to least within the indictment.

You shall not proceed to consider any lesser included offense until you have first made a unanimous determination that the defendant is not guilty of the immediately preceding greater offense or you unanimously have a reasonable doubt of the defendant's guilt of that offense.

See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 7.05, 7.06, and 41.01 (6th ed. 2001).

In considering these issues, we recognize that a defendant in a criminal case has a constitutional right to a correct and complete charge of the law, so that each issue of fact raised by the proof will be submitted to the jury on proper instructions. State v. Dorantes, 331 S.W.3d 370, 390 (Tenn. 2011) (citing State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005); State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001); State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000)). It follows then that trial courts have a duty in criminal cases to instruct the jury on the law applicable to the facts of a case. State v. Clark, 452 S.W.3d at 294-95 (Tenn. 2014) (citing State v. Thompson, 285 S.W.3d 840, 842 n.1 (Tenn. 2009); State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999)). A trial court's instructions "must describe and define each element of the offense or offenses charged." Id. at 295 (citing Faulkner, 154 S.W.3d at 58; State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989)). The sufficiency of jury instructions is a question of law that this court must review de novo with no presumption of correctness. Id. (citing State v. Hawkins, 406 S.W.3d 121, 128 (Tenn. 2013); Nye v. Bayer Cropscience, Inc., 347 S.W.3d 686, 699 (Tenn. 2011)).

When reviewing challenged jury instructions, this court must "view the instruction in the context of the charge as a whole" in determining whether prejudicial error has been committed requiring reversal. Id. (citing State v. Rimmer, 250 S.W.3d 12, 31 (Tenn. 2008); State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997)). When "the instruction alone infected the entire trial and resulted in a conviction that violates due process," see State v. James, 315 S.W.3d 440, 446 (Tenn. 2010), or "when the judge's charge, taken as a whole, failed to fairly submit the legal issues or misled the jury as to the applicable law," see State v. Majors, 318 S.W.3d 850, 864-65 (Tenn. 2010), the instruction is prejudicially erroneous. Clark, 452 S.W.3d at 295.

Langston cites to Judge Tipton's concurrence in State v. Earnest Gwen Humphrey, No. M2003-01489-CCA-R3-CD, 2005 WL 2043778, at *14-15 (Tenn. Crim. App. Aug. 24, 2005), perm. app. denied (Tenn. Feb. 6, 2006), to support his claim that the jury instructions in his case were erroneous. In Earnest Gwen Humphrey, the defendant argued that the jury instructions were erroneous because they instructed the jury not to consider voluntary manslaughter until it first acquitted the defendant of second degree murder. Id. at *14. The majority of the panel concluded that the trial court did not err in giving the sequential jury instructions because they did not preclude the jury from considering the lesser charges. Id. (citing State v. Raines, 882 S.W.2d 376, 382 (Tenn. Crim. App. 1994); State v. Mann, 959 S.W.2d 503, 521 (Tenn. 1997) (appendix)).

However, in a separate concurrence, Judge Tipton asserted that "[t]he danger arising from instructing the jury that it must consider and acquit for second degree murder before considering voluntary manslaughter is that the jury is barred from considering the significance of passion relative to the issue of second degree murder versus voluntary manslaughter." Id. at *15. He noted that similar sequential instructions had been held to violate due process. Id. (citing Falconer, 905 F.2d at 1137; Edge v. State, 414 S.E.2d 463, 466 (Ga. 1992)). While acknowledging that "binding precedent in Tennessee allows for the sequential offense consideration instruction," he emphasized that "we should not ignore the potential risk created by the instruction." Id. Judge Tipton then offered the following remedy:

> When evidence justifies an instruction on voluntary manslaughter, the trial court should instruct the jury so as to ensure adequate consideration of both second degree murder and voluntary manslaughter. That is, if a sequential offense consideration instruction is given, the instruction dealing with second degree murder should also advise the jury relative to the issue of passion upon adequate provocation relative to voluntary manslaughter. Such an instruction is contained in T.P.I–Crim. 7.05(a) (8th ed. 2004), which provides after stating the elements of second degree murder:
>
> > The distinction between voluntary manslaughter and second degree murder is that voluntary manslaughter requires that the killing result from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

Id. Judge Tipton observed that this recommended instruction was not given by the trial court in the Earnest Gwen Humphrey case and urged the trial court to use the Tennessee Pattern Jury Instruction in the future. Id. Although Langston cites the Earnest Gwen

Humphrey case, he asserts that Judge Tipton's solution does not solve this dilemma because "a sequential jury instruction, on its face, logically precludes the jury from ever considering the crime of Voluntary Manslaughter even when there is proof of adequate provocation."

We conclude that while the jury instructions given in Langston's case did not substantially follow the current pattern jury instructions, these instructions were consistent with the instructions outlined in State v. Page, 81 S.W.3d 781, 790-93 (Tenn. Crim. App. 2002) (appendix), and substantively followed the 2001 version of the pattern jury instructions, which placed the distinction between second degree murder and voluntary manslaughter behind the voluntary manslaughter charge. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 7.05, 7.06, and 41.01 (6th ed. 2001). This court has consistently upheld sequential jury instructions placing the distinction between second degree murder and voluntary manslaughter after the voluntary manslaughter charge, and the Tennessee Supreme Court has repeatedly denied permission to appeal on this issue. See State v. Chris Jones, No. W2009-01698-CCA-R3-CD, 2011 WL 856375, at *16 (Tenn. Crim. App. Mar. 9, 2011), perm. app. denied (Tenn. Aug. 25, 2011); State v. Mark Hines, No. W2009-00450-CCA-R3-CD, 2010 WL 4286132, at *10 (Tenn. Crim. App. Oct. 27, 2010), perm. app. denied (Tenn. Apr. 14, 2011); State v. Billie Joe Welch, No. E2005-02293-CCA-R3-CD, 2006 WL 2737830, at *14 (Tenn. Crim. App. Sept. 26, 2006), perm. app. denied (Tenn. Feb. 26, 2007); Earnest Gwen Humphrey, 2005 WL 2043778, at *14-15 (Tipton, J., concurring). However, in upholding these instructions, this court concluded that "the better practice is to adhere to the approach in the Tennessee Pattern Jury Instruction which provides the distinction between second degree murder and voluntary manslaughter in the instruction for second degree murder." See Chris Jones, 2011 WL 856375, at *16; see also Mark Hines, 2010 WL 4286132, at *10; Billie Joe Welch, 2006 WL 2737830, at *14; Earnest Gwen Humphrey, 2005 WL 2043778, at *14-15 (Tipton, J., concurring).

Therefore, we are constrained to conclude that the jury instructions in Langston's case were not prejudicially erroneous. However, for the reasons set out in this opinion, we strongly recommend that this trial court, and all other trial courts, use the current version of the applicable pattern jury instructions, which places the distinction between second degree murder and voluntary manslaughter in the instructions for both offenses. See 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 7.05(a), 7.06, and 41.01 (19th ed. 2015). Although the record shows the trial court was attempting to avoid repetition by including the distinction only one time after the voluntary manslaughter charge, the result was that the jury was not clearly advised of the voluntary manslaughter offense at the same time it was considering the second degree murder offense. While the instructions given in this case, which essentially followed an outdated 2001 version of the Tennessee

- 23 -

Pattern Jury Instructions, did not rise to the level of being prejudicially erroneous, they also fell short of being the best instructions available for these offenses.

**IV.** **Sufficiency of the Evidence.** Langston contends that the evidence is insufficient to sustain his conviction for second degree murder. He claims "[t]he State did not prove beyond a reasonable doubt that [he] acted knowingly, i.e., that the shooting was not with adequate provocation sufficient to mitigate the offense to voluntary manslaughter." He emphasizes that he and the victim had a troubled marriage, there had been allegations of infidelity, the police had been called to their home, and the victim had threatened to stab him with a knife just before the shooting. Langston asks that this court grant him a new trial on this charge or, alternatively, modify his conviction to voluntary manslaughter, reckless homicide, or criminally negligent homicide. We conclude that the evidence is sufficient to support Langston's conviction for second degree murder.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing Majors, 318 S.W.3d at 857).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Dorantes, 331 S.W.3d at 379 (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). "This Court neither re-

weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

Langston asserts that he should have been convicted of voluntary manslaughter rather than second degree murder. Second degree murder is defined as "[a] knowing killing of another[.]" T.C.A. § 39-13-210(a)(1). It is well established that second degree murder is a result-of-conduct offense. State v. Brown, 311 S.W.3d 422, 432 (Tenn. 2010); Page, 81 S.W.3d at 787. Therefore, as pertinent in this case, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b). Whether a defendant acts knowingly in killing another is a question of fact for the jury. Brown, 311 S.W.3d at 432; State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). On the other hand, voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a).

Although Langston claims that the evidence presented at trial established adequate provocation, the proof, when viewed in a light most favorable to the State, shows that Langston knowingly killed his wife and did not kill her in a state of passion produced by adequate provocation. In the months prior to the shooting, the arguments between Langston and the victim had escalated. Langston admitted to police that after escaping the victim with the knife, he went to his shed, retrieved his loaded handgun, reentered his home, and aimed the gun at the victim. Although Langston claimed that the gun fired because it was not operating properly, Agent Braswell concluded, after conducting several test fires, that the gun was not malfunctioning. She said that the gun had two functioning safety mechanisms that prevented it from being fired unintentionally and that this gun would not fire unless someone pulled the trigger. She added that the gun's trigger guard prevented an individual from accidentally pulling the trigger. Moreover, Agent Braswell observed that the trigger on this gun was not a hair trigger because the trigger pull was in the medium range at 6.5 pounds of pressure.

Additionally, Dr. Erica Curry testified that the victim sustained a fatal gunshot wound with the bullet entering at her left eyebrow and transacting the brain stem and cerebellum before exiting the back of the skull. Although Langston claimed he was eight feet away from the victim when the gun fired, Dr. Curry opined that the gunpowder stippling near the entrance wound indicated that the gun had been fired at the victim from an intermediate range of between six inches and three feet. Based on all of this evidence, a rational jury could have found beyond a reasonable doubt that Langston committed a knowing killing rather than a killing due to adequate provocation. See Williams, 38 S.W.3d at 539 (stating that the jury's decision to reject the notion of adequate provocation was within its prerogative); State v. Johnson, 909 S.W.2d 461, 464 (Tenn.

Crim. App. 1995) ("Whether the acts constitute a 'knowing killing' (second degree murder) or a killing due to 'adequate provocation' (voluntary manslaughter) is a question for the jury."). Therefore, we conclude that there was sufficient evidence to sustain Langston's conviction for second degree murder.

**V. Sentencing.** Lastly, Langston argues that his mid-range sentence of twenty years for his second degree murder conviction is excessive. He asserts that the trial court erred in disregarding or ignoring the mitigating factors "set forth in [his] pleading, argued at sentencing[,] and supported by the record." Specifically, he claims the record supports a finding that he acted under strong provocation, that substantial grounds existed tending to excuse or justify his conduct, that he attempted to provide aid to the victim, that he assisted the authorities in locating or recovering the weapon, that he was not likely to reoffend, that he is remorseful for his actions, that he has a strong work ethic, and that he has almost no criminal record. Because the record shows the trial court properly addressed the purposes and principles of sentencing as well as the applicable enhancement and mitigating factors, we uphold the sentence in this case.

At Langston's sentencing hearing, Fatina Allen, the victim's sister, testified that the victim's death had been devastating to her and that K.L. had been receiving counseling following her mother's death. Allen read a letter from K.L., wherein she stated that it was hard living without her mother and that the murder had changed her. Allen acknowledged that while Langston was released on bond, he visited K.L. and provided more financial support than ordered by the juvenile court.

Bernadette Sutton, another of the victim's sisters, testified that she was distraught by the victim's death. Marshaye Smith, the victim's best friend, stated that she would never be the same after the victim's death and that it was unfair for the victim to be taken away from her promising future. Tiara Mayo, the victim's niece, read a statement in which she asked the court to sentence Langston to the maximum sentence .

Michael Reddoch testified that Langston was a friend and an excellent employee and that Langston had expressed remorse regarding the victim's death.

Carl Lyles, Langston's friend and a co-worker at the Memphis County Club for many years, testified that Langston was "a good guy [and an] outstanding waiter." Although Lyles heard Langston often arguing with the victim over the phone, he said that these arguments stemmed from the victim's repeated failure to pick up Langston from work. Lyles said that Langston had expressed remorse over the victim's death.

Paul McClure, a member of the Memphis Country Club, testified that Langston went above and beyond what was required in serving his extended family over the years.

He described Langston as a "kind and gentle soul" and did not believe Langston was dangerous.

A letter was entered into evidence from Michael Babb, the general manager of the Memphis Country Club, discussing Langston's history as an employee . In addition, several people attended the sentencing hearing in support of Langston, although they did not testify.

Langston made an allocution at the sentencing hearing in which he said that he was "truly sorry for what happened." He also said that he loved his wife and his daughter and that "he never meant to take [his] wife from [his] daughter nor her family."

After hearing this proof, the trial court stated that it had considered all of the evidence from the pre-trial motions, the trial, and the sentencing hearing. It also considered the presentence report, the presentence filings made by the parties, and the arguments presented at the sentencing hearing.

The trial court acknowledged that Langston, forty-six-years-old, had a criminal history because of his misdemeanor conviction for disorderly conduct; however, the court gave this enhancement factor very little weight and almost considered it a mitigating factor given the modest nature of the conviction. See T.C.A. §§ 40-35-113(13), -114(1). The court applied the enhancement factor that Langston "possessed or employed a firearm during the commission of the offense," see id. § 40-35-114(9), giving some weight to this factor because the legislature had expressed its intent for crimes committed with a deadly weapon to be treated more harshly. The trial court chose not to apply enhancement factor (15), that "[t]he defendant committed the offense on the grounds or facilities of a pre-kindergarten through grade twelve (pre-K-12) public or private institution of learning when minors were present." See id. § 40-35-114(15). However, it did consider, as a part of the nature and circumstances of the case, the fact that a one-year-old child and Langston's twelve-year-old daughter had been present in the home when Langston shot the victim, which made this "a worse crime than it would had those children not been present."

As to the mitigating factors, the trial court noted that Langston's work history and volume of support spoke "loudly in his behalf." He also noted that Langston had "built relationships with a number of people" through his work, which shed light on "the kind of person" Langston was. The court observed that if it only considered the impact on the victim's family, it would be "very easy to sentence Mr. Langston to twenty-five years," the maximum sentence for second degree murder. However, it also recognized that Langston was not likely to reoffend and that Langston would have support from others in the future, which supported a minimum sentence of fifteen years. The trial court said it

was "faced with trying to fashion a sentence that [was] appropriate for the seriousness of this offense so as not to depreciate what was done." It also observed that while "it was a very close question for the jury between voluntary manslaughter and murder in the second degree," the jury determined that Langston had committed "a knowing killing," and the court found "ample proof in the record based on [his] leaving the house to get the weapon and com[ing] back" to accept the verdict as the thirteenth juror. After considering all these matters, the court imposed a sentence of twenty years at one hundred percent release eligibility. See id. §§ 39-13-210(a)(1), 40-35-112(a)(1), 40-35-501(i).

Initially, we recognize that the 2005 amendments to the sentencing act "served to increase the discretionary authority of trial courts in sentencing." State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In light of this broader discretion, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." Id. at 706. The amendments to the sentencing act also "rendered advisory the manner in which the trial court selects a sentence within the appropriate range, allowing the trial court to be guided by–but not bound by–any applicable enhancement or mitigating factors when adjusting the length of a sentence." Id. Because of this broader discretion,

> a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005. So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld.

Id. This court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following when determining a defendant's sentence:

(1)     The evidence, if any, received at the trial and the sentencing hearing;
(2)     The presentence report;
(3)     The principles of sentencing and arguments as to sentencing alternatives;
(4)     The nature and characteristics of the criminal conduct involved;
(5)     Evidence and information offered by the parties on the mitigating

- 28 -

and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The trial court should consider the defendant's potential for rehabilitation or treatment. Id. §§ 40-35-102(3)(C), -103(5). In addition, the court should impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. §§ 40-35-103(2), (4). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d), Sentencing Comm'n Cmts.

Langston argues that the trial court should have applied the following mitigating factors: (2) he acted under strong provocation; (3) that substantial grounds existed tending to excuse or justify his conduct, though failing to establish a defense; and (10) he assisted the authorities in locating or recovering any property, namely the gun, involved in the crime. See id. § 40-35-113(2), (3), (10). In addition, under the "catch-all" mitigating factor, Langston asserts that the court should have considered that he was unlikely to reoffend, that he was remorseful for his actions, that he had a strong work ethic, that he had almost no criminal record, and that he attempted to provide aid to the victim. See id. § 40-35-113(13).

As we noted, the trial court is guided by, but not bound by, any applicable enhancement or mitigating factors when imposing a sentence, and we will not disturb a trial court's sentence unless the court wholly departed from the purposes and principles of the Sentencing Act. See Bise, 380 S.W.3d at 706. The record shows that the trial court carefully considered the evidence as well as the proposed enhancement and mitigating factors. Although Langston argues that the trial court erred in failing to apply the mitigating factors (2), (3), and (10), the record does not support the application of these factors. Because Langston safely exited the home before obtaining his handgun and reentering the house, we do not believe that Langston acted under strong provocation, as in factor (2), or that substantial grounds existed tending to excuse or justify his conduct, as in factor (3). We also do not believe mitigating factor (10) was applicable given the facts and circumstances in this case. As to the other claims under mitigating factor (13), the record shows that the trial court considered all of these matters with the exception of Langston's attempt to render aid to the victim, which was not supported by the proof at trial.

- 29 -

The trial court carefully considered the evidence supporting both the State's request for a maximum sentence and the defense's request for a minimum sentence before sentencing Langston to a mid-range sentence of twenty years. The court articulated both the reasoning in applying each mitigating and enhancement factor and the weight it gave to each factor. Because the record shows the trial court properly considered the purposes and principles of sentencing as well as the applicable enhancement and mitigating factors, we uphold Langston's twenty-year sentence.

## <u>CONCLUSION</u>

Based on the aforementioned authorities and reasoning, the judgment of the trial court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE